**W. H. NEIL and Aileen W. Neil, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 17647.**

United States Court of Appeals
Fifth Circuit.

Aug. 13, 1959.

Tuttle, Circuit Judge, dissented.

R. B. Cannon, Fort Worth, Tex., Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., of counsel, for petitioner.

Morton K. Rothchild, Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, and Howard A. Heffron, Asst. Attys. Gen., Arch M. Cantrall, Chief Counsel, I.R.S., John M. Morawski, Atty., I.R.S., Washington, D. C., for respondent.

Before RIVES, Chief Judge, and HUTCHESON and TUTTLE, Circuit Judges.

C.A. § 1 et seq. Congress has not done this with regard to suits of the kind before us on this appeal.

HUTCHESON, Circuit Judge.

The appeal in these consolidated cases from decisions of the Tax Court entered on July 30, 1958, involves deficiencies in income taxes aggregating about $78,000 and penalties aggregating about $12,000 for the years 1949–1953, both inclusive.

The principal question presented for determination is whether there is includable in W. H. Neil's income all the income from the partnership interest standing in his name, or whether such income is taxable one-third to him and one-third to each of his two sisters. Subordinate questions, whose determination depends upon the answer to the first question are: whether petitioners are liable for penalties and the amount of such penalties for failing to file declarations of income tax; and whether the assessment against Neil of the deficiencies for 1949 are barred by limitation.

The Tax Court's lengthy and argumentative statement of the case, labelled, "Findings of Fact", is not published, and to endeavor to separate its findings of fact from its conclusions of law would be a difficult and unrewarding, if not impossible task. It will be necessary, therefore, for us to state from the record and set out in the margin the undisputed facts [1] as taxpayer's allegations, the doc-

---

1. Early in 1946, W. H. Neil, then 22 years of age, in his second year of medical school and like most college students possessed of neither capital nor independent income nor free time in which to engage in the carrying on of any business enterprise, was at home on vacation between semesters at the medical school. His father, J. R. Neil, Manager of the Fort Worth plant of the Container Corporation of America and a personal friend of O. P. Leonard of Fort Worth, Texas, who was planning to purchase certain automotive equipment and rolling stock and lease them to Container Corporation for operation by lessee through its own employees, offered to finance the purchase of one-half interest in such automotive equipment and rolling stock, W. H. Neil to take such one-half interest in his own name but hold it for himself and his two minor sisters (Maryanne, aged 20, and Nancy, aged 15) in equal undivided interests, viz., one-third of such one-half interest, or one-sixth of the whole, for each of them.

Thereafter the following things were done:

W. H. Neil and O. P. Leonard, Trustee, agreed that O. P. Leonard, Trustee, should purchase automotive equipment and rolling stock to be leased to Container Corporation; that one-half of the costs and expenses were to be charged to each of them; that any profit which might be realized was to be divided equally between them annually; that all property purchased was to be owned equally by them; and that Leonard, Trustee, was to have exclusive charge and control of all matters necessary and proper for carrying out the automotive equipment and rolling stock leasing agreement with Container Corporation.

Testimony of Jenkins Garrett, Leonard's counsel.

The contemplated leasing agreement was entered into between Container Corporation and O. P. Leonard, Trustee, whereby the latter agreed to furnish for the use of Container Corporation and to maintain a truck, tractor and semi-trailer for a four-year period with option on the part of lessee to purchase the same and to provide other automotive equipment and rolling stock and subject the same to the lease when requested by the Container Corporation.

J. R. Neil, father of W. H. Neil, under his aforesaid agreement with W. H. Neil, advanced the sum of $5000 in cash towards the purchase of equipment and personally guaranteed without limitation all obligations assumed by W. H. Neil under the latter's agreement with O. P. Leonard, Trustee.

When his short between-semesters vacation during which the foregoing things had occurred ended, W. H. Neil returned to medical school and remained in medical school until he graduated in 1948. Following his graduation, his internship and a residency in a Dayton, Ohio hospital and naval service kept him almost constantly absent from Fort Worth until in November, 1952.

In 1948, the O. P. Leonard, Trustee, Trucking Account, having acquired and paid for all of the physical equipment needed by Container Corporation out of the initial fund of $10,000 paid into the venture ($5000 by the Leonard interests and the $5000 advanced by J. R. Neil) and out of subsequent profits, made cash distributions to W. H. Neil totaling $9000. Out of these distributions, the $5000 cash advance of J. R. Neil was repaid to him and the remaining $4000

was invested by W. H. Neil for the benefit of himself and his sisters by lending the same to J. R. Neil at five percent interest under a continuing agreement whereby all distributions from the O. P. Leonard, Trustee, Trucking Account with respect to the interest in such truck ownership and leasing venture appearing in the name of W. H. Neil were *similarly* invested.

For the calendar year 1946 through 1951, A. S. Hedley, an accountant at Fort Worth, Texas, kept records for W. H. Neil and prepared all of Neil's income tax returns from the record which he, Hedley, kept. In the income tax returns so prepared by Hedley for the years 1946, 1947, and 1948, Hedley included a full fifty percent of the taxable income of the O. P. Leonard, Trustee, Trucking Account in the individual income tax return of W. H. Neil. The returns so prepared were accepted by W. H. Neil without question. When, however, W. H. Neil had graduated from medical school and had an opportunity to pay some attention to his own affairs, he discovered this and took his accountant to task, but Hedley explained that *it was necessary to report the income from the leasing of trucks in this manner because there was no instrument in writing evidencing Neil's sisters' interests in the automotive equipment and rolling stock leasing venture,* whereupon Neil promptly took the matter up with an attorney in general practice in the City of Fort Worth, Texas, and instructed him to draw such instruments as might be necessary to evidence the ownership of Maryanne and Nancy Neil in the joint venture carried under the name of O. P. Leonard, Trustee, Trucking Account. An *instrument aimed at accomplishing* this was prepared by such attorney and executed by W. H. Neil and his two sisters on Jan. 1, 1949.

See Neil's testimony on pages 98 and and 99 of the Record, where he testified:

"I got to looking these returns over in 1948 and I began to wonder why I was paying all of the tax when actually *this thing was set up and it was understood that it was set up for me* and my sisters and they had not been paying the tax. At or about that time I consulted Mr. John Scott, an Attorney of Fort Worth, told him what the arrangements were, and asked him to draw whatever instruments were necessary to make that agreement of record. Joint Exhibit 4–D which has been handed me is the *document* Mr.

Scott prepared for me following my consultation with him in 1948."

See also the testimony of Mr. Scott, pages 101–102–103 of the Record. He testified on Page 102 that W. H. Neil and J. R. Neil stated to him that W. H. Neil was in a partnership or joint venture arrangement with O. P. Leonard, *Trustee, and that W. H. Neil in such* capacity was in effect a trustee for his two sisters, that he asked them if they desired that he write an amendment to the partnership arrangements that they had with Leonard *to which they stated that* was not necessary, that Leonard had understood it and that what they wanted was something evidencing the transaction between Neil and his two sisters and *pursuant to the conversation, he drafted* the document in evidence, and he also told them *that the earnings of the partnership attributable to the net interest* would be taxable, whether paid to them *or not, and they should take care to see* that the earnings of that partnership were carefully reported in tax to the three individuals. One page 103, he testified that he advised Neil and his two sisters *that under the arrangement existing,* each of them owned a one-third interest in the one-half interest of the Leonard Trustee Truck Account and that he thought his advice was correct.

By *entries dated January, 1949,* W. H. Neil's capital account in the books and records kept for him by A. S. Hedley was charged with $14,227.44 and $7,213.72 was credited to each of his sisters. When these entries had been made, W. H. Neil's books showed one-sixth of the capital of the O. P. Leonard, Trustee, Trucking Account to be owned by him and a like interest to be owned by each of his sisters. From and after January 1, 1949, one-third of the total income of the O. P. Leonard, Trustee, Trucking Account was credited to the capital account of W. H. Neil and one-third to the capital account of each of his two sisters and, in all income tax returns filed by the three for the year 1949 and subsequent taxable years, each reported one-sixth of the taxable income of the automotive equipment and rolling stock leasing venture.

Neither W. H. Neil nor either of his sisters advanced any capital to the O. P. Leonard, Trustee, Trucking Account nor *did any one of them at any time take* part in the operations of the truck rental business. All of the affairs of that business were handled by O. P. Leonard. A. S. Hedley never at any time informed W. H. Neil that he was required to file

umentary evidence, and the brief but undisputed testimony of his three witnesses establish them to be.

On this record, which contains not a single fact in contradiction of the testimony of petitioner and his witnesses or of the instrument signed by Neil and his sisters in 1949, petitioner contended below and contends here that in the tax years in question the one-half undivided interest in the Leonard partnership, which stood in W. H. Neil's name, was beneficially owned in equal shares by him and his two sisters, and the income therefrom was taxable to each of the three equally.

The Tax Court recognizing that the evidence was all one way and that there was no question of veracity in the case but only of the sufficiency, the legal effect, of the facts testified to, foreshadowed and keynoted the conclusion at which it did arrive by stating:

*"We do not doubt that there was some intent and understanding that the petitioner's two sisters were to derive some benefit from this enterprise provided it turned out to be successful, but this is not to say that they became partners."* (Emphasis supplied.)

Turning, then, to a discussion of the instrument under which all of the income in question here was received and returned for taxes,[2] the court, in the face of the language of the instrument and of conclusive testimony to the contrary as to its purpose and effect, stated that it did not think that the execution of that instrument was effective to make the sisters partners in the Leonard partnership or members of a sub-partnership with

declarations of estimated tax and no such declarations of estimated tax were filed by or for W. H. Neil for any of the years 1949, 1950 or 1951. Discovering late in 1952 that such declarations of estimated tax were required, W. H. Neil terminated his employment of Hedley because he considered him incompetent and engaged the accounting firm of Ernst and Ernst to handle his income tax matters from that time forward.

At March 7, 1955, unless W. H. Neil was required to include a full one-half rather than one-sixth of the 1949 taxable income of O. P. Leonard, Trustee, Truck Account in his own taxable income, the assessment of any deficiency in tax or penalties or additions thereto for the calendar year 1949 was barred by limitation.

2. "This agreement is made by and between William Henry Neil, Mary Anne Neil and Nancy Claire Neil.

"William Henry Neil is interested in a certain motor truck rental business with O. P. Leonard, which business is conducted under the general name and style of O. P. Leonard, Trustee. William Henry Neil's original investment and association with O. P. Leonard arose from funds supplied to William Henry Neil by J. R. Neil of Fort Worth, Texas, father of the three signatories to this agreement, and which said funds were made available as a loan to William Henry Neil with the understanding by and between William Henry Neil and J.

R. Neil that William Henry Neil would treat said business operation as an equal partnership between himself and the other signatories to this agreement so that from and after January 1, 1949, all net sums received by William Henry Neil should be divided into three equal parts and paid to the three signatories to this agreement. Provided, however, that it is expressly understood and agreed that William Henry Neil is authorized to make investments for and in behalf of the other signatories to this agreement, so long as proper books and records are kept showing the interests and amounts due the respective signatories to this agreement, and each of said signatories shall have the right to demand and receive from William Henry Neil a partition of such invested funds at any time that the signatory so demands, after attaining the age of 21 years. In connection with such investments the parties agree that William Henry Neil shall not be liable for errors or losses arising from such investments, but is fully authorized to make any character of investments, prudent or otherwise, as he deems advisable, subject only to his obligations and duty to fully account to the other signatories to the agreement for their interests therein.

"In Testimony Whereof we have hereunto set our hands this first day of January, 1949.

"(Signed)   W. H. Neil
"(Signed)   Nancy Neil
"(Signed)   Maryanne Neil"

their brother. Continuing the same wishful thinking in the same vein, in express contradiction of the fact that the instrument was drawn as a result of Neil's discovery of the way the tax returns had been mishandled and for the purpose of assuring that this would not again occur, the Tax Court came up with this complete misinterpretation:

"As we read this instrument, it does not purport to make the sisters members of any partnership. It merely provides that 'all net sums' received by the petitioner shall be divided equally between the petitioner and his sisters. We incline to the belief that the language used was intended to mean that after Jan. 1, 1949, the sisters were to share in the petitioner's distributive share of the income of the Leonard Partnership. But even if it be construed as broad enough to cover any distribution after Jan. 1, 1949, the use of the term 'net' must be given effect, and we think it means that the sum in which the sisters would share is the net sum, after deduction of any capital invested by the petitioner and after payment of any liability he had incurred as a partner. Accordingly, we do not construe this contract as vesting in the sisters any interest in the capital invested in the partnership. Thus, even under this agreement, the sisters may not be considered as partners since they did not have any capital invested in the venture."

Of the petitioners' argument, that the instrument of January 1, 1949, was the reduction to writing of a previous existing express oral trust, that such trust when declared in writing was one for the benefit of the three signers and that under Sec. 167(a) (1) of the Code, 26 U.S. C.A. § 167(a) (1), a ratable share of the trust income was annually taxable to each of the three signers, the Tax Court, completely ignoring that for the tax years the trust was acknowledged in writing, said:

"The principal weakness of this argument is that there is no basis in the evidence for the view that there was an oral trust for the benefit of the petitioner's sisters when the truck leasing operation was started."

Stating that until 1949 the evidence indicated that petitioner treated the investment as his own, the court went on to say that neither in the original arrangement nor by the instrument of January 1, 1949, were the terms and circumstances sufficient to place Neil's Leonard partnership interest in trust for the benefit of himself and his sisters, and, following the same assumptive reasoning, the court thus arrived at this sweeping conclusion of law:

"Upon careful consideration of all the evidence, we find no basis, under either the partnership or trust provisions of the Code, for treating as income of the petitioner's sisters any part of the income derived by him from his investment in the truck leasing business. It is our opinion that insofar as the agreement of Jan. 1, 1949 deals with the income from the Leonard partnership, it was no more than an anticipatory assignment by the petitioner of his income from that venture."

Here taxpayers, urging upon us that the Tax Court, with its misconception of the undisputed facts and upon assumptions which were expressly rejected and condemned in Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, at pages 737–746, 69 S.Ct. 1210, at pages 1211–1216, 93 L.Ed. 1659, and with its gaze fore-shortened by its intense preoccupation with its erroneous views on the partnership question and its predetermined view that the case was one merely of anticipatory assignment of income, was unable to see and decide the case as it really is, attack the conclusions of the Tax Court as wholly erroneous and as resulting from such complete misapprehension of the nature and effect of the evidence, that they do not reflect or rep-

**568**

resent the truth and right of the case. Sanders v. Leech, 5 Cir., 158 F.2d 486, 487; United States v. United States Gypsum Co., 333 U.S. 364, at page 395, 68 S.Ct. 525, at page 541, 92 L.Ed. 746. We agree with the taxpayers that this is so.

Notwithstanding the fact that the opinion in the Culbertson case, supra, carefully pointed out the errors into which the Tax Court had fallen, that court, as appears in its action in the second appearance of the Culbertson case, Culbertson, v. C. I. R., 5 Cir., 194 F.2d 581, and in the wrecks of its other decisions on the shores of this and other appellate courts, has been reluctant to recognize and turn away from them. Some of the explanation is to be found in the unwillingness of the Tax Court to recognize and apply the tax law of partnership as it is established in the Culbertson decision and the multitude of cases, collected in Shepherd's Notes to that case, citing and following it, and by Sec. 3797(a) (2) I.R.C.1939, 26 U.S.C.A. § 3797(a) (2) and § 340(a) of the Internal Revenue Act of 1951, which declares:

> "A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by gift or purchase from any other person."

■ There is no principle in tax law which requires or permits the trier of facts to set up a special concept of partnership for tax purposes or to treat the facts in a tax case differently from the way they should be treated in any other kind of litigation. Indeed, the decisions are to the contrary.[3]

Another explanation is to be found in the use by the Tax Court of the brilliant figure of speech in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, not as a guide to a true determination of the question posed but as a shibboleth in all transactions between members of a family, whether through partnerships or by trusts, an approach which the Supreme Court in the Culbertson case, after having held that it is not essential that a member of a family partnership contribute either *vital services or original capital,* condemned in these words:

> "The fact that transfers to members of the family group may be mere camouflage *does not, however, mean that they invariably are.*" (Emphasis supplied.) [337 U.S. 733, 69 S.Ct. 1216.]

■ Since the Culbertson case from this court was affirmed in principle in the Supreme Court, this and other courts have taken pains to consistently declare and apply these now settled principles of tax law. These are that in all cases, whether the claim *to income of a member of a family is based upon a claim as a partner or as beneficiary of a trust,* the controlling question for decision is not.

3. Compare what is said in the concurring opinion of Mr. Justice Frankfurter, in Commissioner of Internal Revenue, v. Culbertson, 337 U.S. at pages 753–754, 69 S.Ct. at page 1220:

"* * * It is not for this Court, by redefinition or the erection of presumptions, to amend the Internal Revenue Code so as virtually to ban partnerships composed of the members of an intimate family group.

"The present case, nevertheless, is not the first manifestation of an impression that the Tower opinion [Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670], had precisely such an effect. It seems to me important, therefore, to make crystal clear that there is no special concept of 'partnership' for tax purposes, while at the same time recognizing that in view of the temptations to assume a virtue that they have not for the sake of tax savings, men and women may appear in a guise which the gimlet eye of the Tax Court is entitled to pierce. We should leave no doubt in the minds of the Tax Court, of the Courts of Appeals, of the Treasury and of the bar that the essential holding of the Tower case is that there is 'no reason' why the 'general rule' by which the existence of a partnership is determined 'should not apply in tax cases where the Government challenges the existence of a partnership for tax purposes.'" Cf. Turner v. Commissioner, 5 Cir., 199 F. 2d 913.

whether the claim is made by a member of a family but under general law, whose was the tree that produced the fruit, whose the services or property which produced the income. Cf. Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465; Dyer v. Commissioner, 2 Cir., 211 F.2d 500.

We have recently carefully pointed this out in West v. Commissioner, 5 Cir., 214 F.2d 300, 302,[4] where the Tax Court, by labelling the arrangement under which the income was owned by the beneficiaries of a trust a "spurious family partnership", sought erroneously, as here, to separate the income from its earners, the fruit from the tree.

█ It is certainly true that if in the tax years in question the sisters in this case had no title or interest with Neil in the venture, they would have no title to, or interest in, the fruits. It is as certainly true, under the Tax Court's own conclusion, that it was intended from the beginning that the sisters were to derive some benefit from the enterprise, "if it became profitable". Under the undisputed evidence that, as to the tax years in question, giving due weight to all the facts and circumstances, including particularly the 1949 written declaration of trust entered into between the brother and his sisters for the express purpose of correcting the errors of the earlier returns which had incorrectly credited all the income to him, it must be held as matter of law that they had such an interest and that the Tax Court's holding to the contrary was wholly unjustified. In case after case this court and others have insisted on standing to and applying the principle first enunciated in Lucas v. Earl, supra, and clarified in the Culbertson and Blair cases, supra, and if this court remains consistent with the law as its former decisions have declared it, it must so declare here and reverse the judgment of the Tax Court.

The judgment is reversed and the cause is remanded to the Tax Court with directions to find the correct amount of the additions to the tax, if any, under Section 294 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 294.

RIVES, Chief Judge (concurring specially).

The documentary evidence coupled with the undisputed and admittedly credible testimony is clearly sufficient to control the disposition of this case. All of the income in question was derived from a truck lease agreement with Container Corporation of America entered into by O. P. Leonard, Trustee, pursuant to an agreement quoted in the margin.[1] The

---

4. Henslee v. Whitson, 6 Cir., 200 F.2d 538; Alexander v. Commissioner, 5 Cir., 190 F.2d 753; Ardolina v. Commissioner, 3 Cir., 186 F.2d 176; Ginsburg v. Arnold, 5 Cir., 185 F.2d 913; Marcus v. Commissioner, 5 Cir., 201 F.2d 850; Miller v. Commissioner, 6 Cir., 203 F.2d 350; Nicholas v. Davis, 10 Cir., 204 F.2d 200; Seabrook v. Commissioner, 5 Cir., 196 F.2d 322; Tomlinson v. Commissioner, 5 Cir., 199 F.2d 674; Visintainer v. Commissioner, 10 Cir., 187 F.2d 519; Wofford v. Commissioner, 5 Cir., 207 F.2d 749. Cf. Commissioner of Internal Revenue v. Reece, 1 Cir., 233 F.2d 30.

1. "This agreement made as of ......... day of March, 1946, by and between O. P. Leonard as Guardian of Obie Paul Leonard, Robert Wooldridge Leonard, Margery Ann Leonard and Martha Jane Leonard, minors, and William H. Neil.
"Whereas, Container Corporation is desirous of leasing certain rolling stock for use in its business and the undersigned wish to furnish said equipment to said corporation.
"Now therefore, in consideration of the agreements herein recited, the undersigned in the capacity stated, agree:
"1. O. P. Leonard, Trustee is hereby authorized and empowered to execute on behalf of the undersigned, the lease attached hereto and which is made a part of this instrument for all purposes.
"2. The said O. P. Leonard, Trustee is to purchase all equipment, to fill and execute all applications, agreements and instruments, and to have exclusive charge and control of all matters necessary and proper for the carrying out of said attached lease contract.
"3. Complete and accurate records of said joint adventure are to be kept by the said O. P. Leonard, Trustee, and a written accounting is to be made by him each three months. One half of all

taxpayer's contribution to that venture consisted entirely of capital and credit: $5,000.00 in cash which he had borrowed from his father, his own agreement to pay "one half of the expenses and cost incurred in said joint adventure," and, doubtless of more importance to Leonard, the letter from the taxpayer's father guaranteeing performance of his obligations.

By January 1, 1949, the O. P. Leonard, Trustee, truck account was enormously prosperous with no unpaid liabilities and no reasonable prospect of becoming insolvent. From his profits the taxpayer had repaid to his father the $5,000.00 loan. As of that date, at the request of taxpayer and his father, an attorney prepared the agreement between the taxpayer and his two sisters which has been quoted in full in footnote 2 to Judge Hutcheson's opinion.

But for the agreement of January 1, 1949, it may be that we could accept as not clearly erroneous the Tax Court's finding that the taxpayer's two sisters were not partners and owned no interest in the venture.[2]

That finding is, however, subject to serious factual criticism and, of more importance, it discloses that the Tax Court was laboring under a mistaken conception of the law.

The original agreement of March 1946 was prepared by Jenkins Garrett, Esquire the general counsel for the Leonard interests, at Mr. Leonard's directions without consulting the taxpayer. Mr. Garrett had no recollection of any conversation with the taxpayer's father, and testified: "* * * I have no independent recollection of dealing with anyone other than Mr. O. P. Leonard." Mr. Garrett further testified:

"* * * Mr. O. P. Leonard asked me if it was possible to work out on (sic) arrangement whereby his children and Mr. Neil's children could enter into a business of furnishing trucks to Container Corporation.

\* \* \* \* \* \*

the expenses and costs incurred in said joint adventure shall be charged to each of the undersigned. Any profit which might be realized from said operation is likewise to be divided equally between the said parties and is to be distributed annually.

"4. All property purchased pursuant to this agreement by O. P. Leonard, Trustee is to be owned equally by the undersigned.

"5. No obligations, indebtedness or expenses can be created by either of the undersigned parties of this joint adventure except as provided for herein.

"Executed this ........ day of March, 1946.

"(Signed) O. P. Leonard
"O. P. Leonard, Guardian of Obie Paul Leonard, Robert Wooldridge Leonard, Margery Ann Leonard and Martha Jane Leonard
"(Signed) William H. Neil
"William H. Neil"

2. Thus expressed in the opinion of the Tax Court:

"It is true that the petitioner testified that when his father loaned him the money his father stated, and it was agreed, that he and his sisters were to share jointly in the venture. However, the character of the transaction and the intention of the parties must be determined not only from the testimony of the petitioner, but from all the evidence, including the conduct of the parties. The statement of an interested party is not necessarily conclusive. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346, affirming 35 B.T.A. 163. As we stated in R. L. Blaffer & Co., 37 B.T.A. 851, affirmed 5 Cir., 103 F.2d 487, certiorari denied 308 U.S. 576, 60 S.Ct. 91, 84 L.Ed. 483, 'To be skeptical of the weight to be accorded an interested witness' statement in view of other evidence is not the same as wholly to reject the statement as if it were dishonest.' We do not doubt that there was some intent and understanding that the petitioner's two sisters were to derive some benefit from this enterprise, provided it turned out to be successful. But this is not to say that they became partners. The sisters were in no way mentioned in the agreement with Leonard. There was quite apparently no obligation on their part to share in losses. Furthermore, the distribution of some $16,000 of income for the year 1948 was treated by the petitioner as his own income in his return, and $5,000 thereof was used to pay his personal debt to his father."

" * * * When he explained his concern or asked the question as to whether or not minors owning the trucks would make any difference, he told me that neither he nor Mr. J. R. Neil, who is the father of W. H. Neil, wanted this for themselves, but wanted it for their children. It was definitely my understanding at that time that the joint venture was for the children of Mr. O. P. Leonard and the children of Mr. J. R. Neil."

Thus, the taxpayer's testimony did not stand alone, as indicated by the Tax Court, but was strongly corroborated by the testimony of Mr. Garrett. True, even Mr. Garrett's testimony is at variance with the agreement which he prepared, but it must be remembered that he was primarily protecting the interest of his own client, Mr. Leonard. Leonard was interested in seeing that the Neils paid $5,000.00 cash into the venture and that the credit of the taxpayer and of his father was pledged. The distribution of the Neils' share of the profit was of no concern to Leonard.

Further, the Tax Court itself states: "We do not doubt that there was some intent and understanding that the petitioner's two sisters were to derive some benefit from his enterprise, provided it turned out to be successful." Thus, the Tax Court concedes that the two sisters were to derive some benefit from the enterprise. The only such benefit which the evidence tends to establish was that the sisters should share equally in the profits with their brother, the taxpayer.

The Tax Court declined to give effect to that understanding because it did not conform to the technical requirements of a common-law partnership, saying: "But this is not to say that they became partners. The sisters were in no way mentioned in the agreement with Leonard. There was quite apparently no obligation on their part to share in losses."

The original agreement of March 1946, heretofore quoted in footnote 1, does not use words appropriate to articles of partnership but repeatedly refers to the truck leasing arrangement as a "joint adventure." Mr. Garrett, the attorney who drew that agreement and also the lease to Container Corporation made a part of the agreement, testified:

"Well, it is merely a lease arrangement akin to a joint ownership of a building which you lease to a tenant. The Container people furnish the drivers and do all the details of it; however, O. P. Leonard as Trustee does handle all the relationships with the representatives of Container Corporation."

Certainly the original agreement was not a common-law partnership in the conduct of which each of the partners acts as the general agent of the others. To the contrary, no one had authority to bind Leonard who was "to have exclusive charge and control of all matters * *." No services whatsoever were required of the taxpayer or of anyone other than Leonard. The $5,000.00 cash having been paid and the credit obligations of the taxpayer and his father not being in default, neither Leonard nor the enterprise could call for more. The taxpayer, whether for himself alone, or for himself and his two sisters, was then entitled to receive one half of "any profit which might be realized from said operation." The sisters, being minor children, could not agree to be responsible for any possible losses. Leonard did not look to them, but was content to rely upon the credit of the taxpayer and his father. The interest in the enterprise in the name of the taxpayer was as truly a property right subject to transfer and assignment, or to being held in trust, as if the business had been incorporated and fifty per cent of its capital stock had been issued in the taxpayer's name. The enterprise was a typical "joint adventure," and was correctly so designated by the experienced counsel who drew the agreement.

In Haley v. Commissioner of Internal Revenue, 5 Cir., 1953, 203 F.2d 815, 818, 819, this Court speaking through the writer said:

"A joint venture has been defined as a 'special combination of two or more persons, where in some specific

venture a profit is jointly sought without any actual partnership **or** corporate designation'. Tompkins v. Commissioner, 4 Cir., 97 F.2d 396, 398; Aiken Mills v. United States, 4 Cir., 144 F.2d 23; See also Mertens' Law of Federal Income Taxation, Vol. 6, Sec. 35.05, p. 118. Section 3797(a) (2) of the Internal Revenue Code (beginning with Sec. 1111(a) (3) of the 1932 Act)[2] has defined the term 'Partnership' so as to include a joint venture, as follows:

" *'Partnership and partner.* The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated · organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.'

"2. For legislative history of this section see Report of Committee on Ways & Means on the Revenue Bill of 1932 contained in Seidman's 'Legislative History of Federal Income Tax Law,' at p. 501."

The written agreement between the taxpayer and his two sisters became effective January 1, 1949, and the tax years here involved, that is the calendar years 1949 to 1953, inclusive, are all subsequent to that agreement. The Tax Court's construction of that agreement[3] seems excessively technical and narrow. The intent of the agreement was obviously to place the two sisters in the same position as if the facts recited in that agreement had been true, that is, as if the $5,000.00 loan from the father (and, though not recited, the extension of the father's credit) had been with the understanding that the taxpayer would treat the business operation as an equal partnership between himself and his two sisters. The instrument of January 1, 1949, was adequate to create a valid trust under the provisions of the Texas Trust Act.[4]

The Tax Court's construction of the agreement of January 1, 1949 (footnote 3, supra), is contrary to the undisputed evidence showing the contemporaneous

---

3. In part, the Tax Court said:
"Nor do we think that the execution of the January 1, 1949, instrument was effective to make the sisters partners in the Leonard partnership or members of a subpartnership with their brother. That agreement recites that the original funds were made available as a loan to the petitioner with the understanding that the petitioner 'would treat said business operation as an equal partnership between himself and the other signatories to this agreement so that from and after January 1, 1949, all net sums received by William Henry Neil should be divided into three equal parts and paid to the three signatories to this agreement.' As we read this instrument, it does not purport to make the sisters members of any partnership. It merely provides that 'all net sums' received by the petitioner shall be divided equally between the petitioner and his sisters. We incline to the belief that the language used was intended to mean that after January 1, 1949, the sisters were to share in the petitioner's distributive share of the income of the Leonard Partnership. But even if it be construed as broad enough to cover any distribution after January 1, 1949, the use of the term 'net' must be given effect, and we think it means that the sum in which the sisters would share is the net sum, after deduction of any capital invested by the petitioner and after payment of any liability he had incurred as a partner. Accordingly, we do not construe this contract as vesting in the sisters any interest in the capital invested in the partnership. Thus, even under this agreement, the sisters may not be considered as partners since they did not have any capital invested in the venture."

4. Article 7425b–7, Vernon's Civil Statutes of the State of Texas reads in part:
"Art. 7425b–7. *Requisites of a trust.* —An express trust may be created by one of the following means or methods:
"A. A declaration in writing by the owner of the property that he holds it as trustee for another person, or persons, or for himself and another person or persons; * * *." See also, Mills v. Gray, 1948, 147 Tex. 33, 210 S.W.2d 985; Fitz-Gerald v. Hull, 1951, 150 Tex. 39, 237 S.W.2d 256.

construction of the instrument by the parties thereto, as indeed recited in earlier findings by the Tax Court itself:

"Capital accounts for Maryanne and Nancy were first entered in the accounts of the petitioner by entries dated January 1949. At that time $14,427.44 was charged to the petitioner's capital account and $7,213.72 was credited to each of his sisters. The entries were described as '⅓ distribution of Joint Venture to W. H. Neil, Nancy Neil, & Mary Ann (sic) Neil.' By other journal entries dated December of each of the years 1949, 1950, 1951, and 1952 charges were made on the petitioner's records to 'Investment a/c' and credits were made to the petitioner and to each of his sisters of one-third of the amount charged to the investment account. The amounts so charged and credited are the same amounts." [5]

The Tax Court was of the opinion, however, that the agreement of January 1, 1949, could not be effective to shift the tax from the taxpayer on the income attributable to the interest standing in his name in the leasing venture under the holdings of Lucas v. Earl, 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, and Burnet v. Leininger, 1932, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665.

Since the income was derived solely from a capital and credit investment in the joint venture, and since the taxpayer (with the consent of his guarantor) had validly agreed that each of his sisters was the beneficial owner of a one-third interest in that investment, this was more than a mere anticipatory assignment of income condemned in Lucas v. Earl, supra. To employ that case's famous figure of speech, his sisters had a share not only in the fruits but also in the tree on which they grew.

On the surface the facts of the present case seems strikingly similar to those in Burnet v. Leininger, supra,[6] but the resemblance is purely superficial. Leininger and one Monaghan (or Monaghan's heirs) were active partners in a common-law partnership known as Eagle Laundry Company. Leininger undertook to make his wife "a full equal partner with him in his interest in the partnership." [285 U.S. 136, 52 S.Ct. 345.] Of course, as the Supreme Court commented, Leininger's wife could not be made a member of the partnership "without the consent of the other partner or partners, and there is no finding of such consent." In the case at bar, the situation is different. Leonard, taxpayer's co-adventurer, had absolutely no concern with the disposition of the pure property interest in the business which stood in the taxpayer's name. In Burnet v. Leininger the income was produced by "the capital of the firm and the labor and skill of its members employed in combination through the partnership relation in the conduct of the partnership business." Here, the Neil interest in the joint venture consisted entirely of an investment of capital and of the credit of the taxpayer and his father, at whose instance the agreement of January 1, 1949, was prepared and executed. The present case is governed by Blair v. Commissioner, 1937, 300 U.S. 5, 11, 57 S.Ct. 330, 81 L.Ed. 465, et seq., rather than by Burnet v. Leininger, supra. In a somewhat similar situation, Judge Lindley speaking for the Seventh Circuit said: "Furthermore, we are dealing with an agreement which made the parties joint venturers and which, thus, amounted to much more than the equitable assignment involved in the Leininger

---

5. A recapitulation of the returns filed by the taxpayer for the years 1946, 1947, and 1948 shows that the interest in his name in the "O. P. Leonard, Trustee, Truck Account" was valued at $21,614.-16.

6. Burnet v. Leininger was decided on March 14, 1932, shortly prior to the Act of June 6, 1932, c. 209, § 1111(a) (3), 47 Stat. 289, which first defined the term "partnership" for income tax purposes so as to include a joint venture. See the legislative history referred to in Haley v. Commissioner of Internal Revenue, supra.

case." Rupple v. Kuhl, 7 Cir., 1949, 177 F.2d 823, 826. In United States v. Atkins, 5 Cir., 1951, 191 F.2d 146, 147, Judge Holmes speaking for this Circuit said:

> "This is not a case of the taxpayer assigning fees, wages, salaries, or other income, to be earned by him in the future from work to be performed by him in the future. Atco's income resulted from capital invested in operating partnerships, and from the services performed by managing partners. The taxpayer did not assign income from those operating partnerships: he assigned his share, his entire interest, in those partnerships to a separate partnership (Atco Investment Company), the members of which firm were engaged in a joint venture. See Rupple v. Kuhl, 7 Cir., 177 F.2d 823, 825. Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665, distinguished."

See also, West v. Commissioner of Internal Revenue, 5 Cir., 1954, 214 F.2d 300.

Sommers v. Commissioner, 2 Cir., 1952, 195 F.2d 680, 681, involved another "sub-venture" where the taxpayer's wife had made a substantial contribution to capital. In a per curiam opinion, the Court (Swan, Chief Judge, and Learned Hand and Augustus Hand, Judges) ruled for the taxpayer and agreed with the doctrine laid down in Rupple and Atkins, supra.

Subsequent to January 1, 1949, it is clear that the taxpayer was the beneficial owner of only a one-sixth interest in the "O. P. Leonard, Trustee, Truck Account."

The parties are in agreement that a holding to that effect will dispose of the subordinate issue as to whether the deficiency determined by the Commissioner for the year 1949 is barred by limitations under Section 275(a) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 275(a). Another subordinate question is whether the Tax Court correctly sustained additions to the taxpayer's tax for failure to file declarations of estimated tax under Sections 294(a) (1) (A) and (2) of the 1939 Code. The petitioners ask this Court "to remand the proceedings to the Tax Court with directions to find the correct amount of the additions to the tax, if any, under Section 294 of the Internal Revenue Code of 1939." The concluding sentence of Judge HUTCHESON'S opinion should be read to include such directions.

For the reasons stated, I specially concur.

HUTCHESON, Circuit Judge.

I concur fully in Judge RIVES' excellent concurring opinion.

TUTTLE, Circuit Judge (dissenting).

With deference to the views of my colleagues, I am constrained to dissent.

At the outset it must be remembered that we are dealing here with income which was paid exclusively to the taxpayer as his partnership share of a business in which, *according* to the *written partnership agreement*, only he and Leonard, as guardian for Leonard's minor children, were the partners. The taxpayer therefore starts with something of a burden to establish some theory on which part of such income earned by such business and distributed to him as a partner rightfully belongs for income tax purposes to his two sisters.

In considering any theory advanced by the taxpayer, we must bear in mind the basic principle that normally income is taxable to him who earns it. I think it clear beyond any question that this income was earned by Neil as a member of a partnership of which the Tax Court was amply justified to find the sisters were not and never intended to be members.

There are several critical facts in this record that are documentary in form and are thus not dependent on oral testimony for their establishment. These facts, it seems to me add up to enough, if not to require the decision made by the Tax Court, then, at the very least, to warrant it.

A partnership contract was entered into in writing between Leonard, as guardian for his children, and W. H. Neil. The two parties were to invest $5,000 each in a business of acquiring and renting trucks to the Container Corporation of America, a relationship which apparently Neil's father, J. R. Neil, could control. Neil's $5,000 came by way of a loan from his father. The partnership agreement made no mention of Neil's two minor sisters, although it did expressly name *Leonard's* four minor children *as the partners* for whom *he* acted.

This business entity, thus created by the written contract, set up partnership books in which all business transactions were faithfully recorded. There was a capital account set up for Leonard, Guardian, and another for W. H. Neil. Leonard conducted all of the business in accordance with a stipulation in the written agreement. Neil's partnership interest was acquired by *his* capital contribution plus the fact that his father guaranteed in writing all of *his* obligations. This guarantee did not mention the sisters.[1]

It was a highly profitable operation. The money poured in. The $5,000 loan was promptly paid back to Neil's father and Neil loaned his father other sums which he received prior to January 1, 1949.

For all the years from the inception of the business through the last tax year the Leonard partnership filed regular partnership information returns which showed Leonard, guardian for his four named children, and W. H. Neil as the only partners. Through March, 1949, Neil filed his own individual income tax returns in which *he reported as personal income to him* his one-half of the net profits from the Leonard partnership.

As of January 1, 1949, Neil and his two sisters signed an agreement which expressly recognized that Neil alone was a partner with Leonard. It stated: "William Henry Neil is interested in a certain motor truck rental business with O. P. Leonard, which business is conducted under the general name and style of O. P. Leonard, Trustee."

As we have just stated, this confirms all of the significant writings and acts of the parties up to that moment.

Moreover, even after this contract was signed, Neil signed his income tax return for the year 1948, in which he reported all the income from the Leonard partnership as his own personal income. No amended returns were ever made seeking to change this return.

Thereafter, for the tax years in question, Neil filed *partnership* returns for W. H. Neil, et al., showing as partners himself and his two sisters. Nowhere did he ever file or cause to be filed a partnership return showing his sisters to be partners in the Leonard partnership.

Now, it seems elemental that under the most liberal treatment ever afforded family partnership situations—certainly under the principles laid down in the Culbertson case, it was within the *compe-*

---

1. It is significant that this guaranty noted that Leonard was acting as guardian for his children, and that no such designation or a designation as trustee was mentioned for Neil. The letter follows:

"March 16, 1946

"O. P. Leonard, Guardian of
Obie Paul Leonard, Robert
Wooldridge Leonard, Margery
Ann Leonard, and Martha Jane
Leonard,
"Fort Worth, Texas.
"Dear Sir:
"I have examined and am familiar with the agreement entered into this date between you *as Guardian of your minor children* and *my son, William H. Neil,* covering the leasing of certain rolling stock to Container Corporation.

"This is to advise you that in consideration of one dollar cash, the receipt of which is hereby acknowledged, and other valuable considerations, I personally will guarantee the payment of all the expenses and cost and the performance of all obligations assumed *by my son* under said agreement should *he* for any reason fail or refuse to pay or perform such." (Emphasis added.)

"Very truly yours,
"(S) J. R. NEIL."

*tence* of the Tax Court to find, as it did, that the Leonard partnership consisted of Leonard as guardian for his children and W. H. Neil, and that it did not include the two girls. And this it could find on this documentary record, notwithstanding the oral testimony given at the trial that when Neil, Sr. loaned the money to his son it was understood between them that the sisters were to share equally.

Certainly nothing contained in the agreement of January 1, 1949, printed in full in footnote 2, 269 F.2d 566, made the sisters members of the *Leonard* partnership. That gambit was tried by a taxpayer in Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 346, 76 L.Ed. 665. The Supreme Court said that one partner in a two-man firm cannot make his wife a partner with him to split up his share of the partnership income by making a sub-partnership agreement with her to that effect. That is the most that can be said of the effect of this 1949 agreement so far as creating a partnership or joint enterprise is concerned.

But now that litigation has commenced, for the first time Neil says that if the 1949 agreement did not make his sisters partners in the business that earned the income, then it created a trust for their benefit and their share of the income from the trust must be taxable to the sisters. This was also dealt with in the Leininger case. There the court said:

"The respondent urges that the assignment to his wife was of one-half of the 'corpus' of his interest and that this 'corpus' produced the income in question. The characterization does not aid the contention. *That which produced the income was not Mr. Leininger's individual interest in the firm, but the firm enterprise itself,* that is, the capital of the firm and the labor and skill of its members employed in combination through the partnership relation in the conduct of the partnership business. There was no transfer of the corpus of the partnership property to a new firm with a consequent readjustment of rights in that property and management. If it be assumed that Mrs. Leininger became the beneficial owner of one-half of the income which her husband received from the firm enterprise, it is still true that he, and not she, was the member of the firm and that she had only a derivative interest." Burnet v. Leininger, 285 U.S. 136, 141, 52 S.Ct. 345, 346, 76 L.Ed. 665.

To be sure a donor, father or brother, has the full and complete power to give property to a trustee, even, possibly, himself as trustee [2] for himself and others, and if properly distributed and properly reported as such, the income *from this trust property* is taxable to the beneficiaries. Here, however, no such thing happened. No trust *res* produced the income here dealt with. The Leonard business partnership produced the income. The members of the Leonard firm earned the income and it was only *after it was thus earned* that this 1949 agreement sought to convey or assign it to the sisters. The language is "so that from and after January 1, 1949, all *net* sums *received by William Henry Neil* should be *divided* into three equal parts and paid to the three signatories to this agreement."

This is not remotely similar to the placing of *property* in trust for another. No peculiarities of the state law play any part in this particular area. The critical thing here is that there is no trust *res which produced the income*. The income, as so clearly pointed out in the Leininger case, supra, was produced by the Leonard partnership.

If we come to the oral testimony we find that it does not specifically conflict with the Tax Court's finding that the sisters were not partners in the Leonard

2. This, however, is doubtful under the so-called "Clifford" doctrine if the donor becomes trustee and reserves substantial dominion over the trust income as was done here. See Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, and its numerous progeny.

business enterprise. There is not a line of testimony, for instance, that either before, or by virtue of the 1949 agreement, the sisters were intended to become partners with Leonard or his children. The course of action of that business clearly negatives the fact that they did. Under the teaching of the Culbertson case cited so feelingly in the court's opinion, such intent and course of dealing are two critical factors to be considered in determining whether a partnership in fact existed. Moreover, the taxpayer in his brief concedes:

"Neither W. H. Neil nor either of his two sisters has ever taken any part in the management or operation of the truck rental business conducted under the provision of the leasing contract. The affairs of that business at all times have been handled exclusively by or under the direction of O. P. Leonard. Moreover, no one of the three of them has ever rendered any service whatever to the truck leasing operation. In fact the two sisters and also W. H. Neil were away from Fort Worth during the greater part of the taxable years involved in this proceeding."

These circumstances are also considered in Culbertson as being of prime significance in determining whether any partnership existed. Here is what the Supreme Court in that case said was the test:

" * * * whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659.

With all deference to the views of my colleagues, I think it perfectly clear that the Tax Court, far from ignoring the teachings of the Culbertson case, actually made careful application of them. With as many of the essential factors favoring the existence of a partnership lacking, I think it little short of amazing that this court should criticize a finding by that court on this record that no such partnership here existed.

Even as to the "sub-partnership," if that is what was intended by the document of 1949, no books were set up for at least three years; no contemporaneous entries of any capital account were set up on the part of the two sisters, and Neil still reported his 1948 income as belonging to him exclusively. This, of course, is entirely apart from the basic proposition that a partnership between these three alone would not serve to divide the income for tax purposes, as noted above and as clearly decided in the Leininger case.

I think the decision of the Tax Court was correct. That court could certainly take the view of the facts that the parties themselves took before a tax purpose became apparent. It was not bound to reject the documentary proof in favor of the testimony of the interested parties when even that testimony was not unequivocal as to the true effect of what was done. It was certainly consistent with all that we and the Supreme Court have said in this field. It will be remembered that the history of the Culbertson case is that this court reversed the Tax Court's decision that no partnership existed. We sought to decide that the facts demanded the contrary result. The Supreme Court reversed our decision and remanded the case to the Tax Court to give effect to its formula for deciding the fact question: "As to which of them [the sons] * * * was there a bona fide intent that they be partners in the conduct of the cattle business, either because of service to be performed dur-

**578**

ing those years or because of contributions of capital of which they were the true owners, as we have defined the terms in the Clifford, Horst [Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75], and Tower cases?"

Some comment is made in the court's opinion relative to the amendment of 1951 to the 1939 Code, which says:

"A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor whether or not such interest was derived by gift or purchase from any other person."

This, of course, merely changes the meaning of capital contribution as used in the Culbertson case. It is no longer necessary that the capital investment which is one of the indicia of an intent to form a bona fide partnership be capital "originating with the partner." This amendment does not change the requirement that there must be a bona fide intent on the part of the parties to engage as partners in a business enterprise. Here the Tax Court, with ample justification, found that no such intent on the part of the sisters existed. Thus the owning of a capital interest in a partnership does not even under that amendment *create* a partnership. It merely defines one of the alternative prerequisites: "service or capital," one of which must be *coupled* with a *bona fide intent* to *engage as partners in a business enterprise* to satisfy the Culbertson definition. It is clear that this amendment is only intended to take the "curse" off of family-originated capital which still lingered in the law after Culbertson because of its reference to the definition of capital in the Tower case. Now it is possible for a father to give or lend his son funds with which the latter can engage in a partnership enterprise with the father,

---

**3.** It was only by virtue of this amendment that W. H. Neil himself could really be considered to be a partner in the Leonard business. Otherwise clearly this Leonard partnership might well be held to be a

if there is in fact a bona fide intent on the part of the pair to carry on a partnership business.[3] The circumstances which the court must consider to determine whether there was such an intent are those set out in the above quoted portion of the Culbertson opinion. Here the court gave full consideration to them and, with ample justification, found that no such intent existed as to the sisters.

I think the decision of the Tax Court should be affirmed.

partnership of the father and Leonard for tax purposes, since the father furnished the capital, guaranteed the credit and provided the only source of profit to the firm.