### ARDOLINA v. COMMISSIONER OF INTERNAL REVENUE.

No. 10197.

United States Court of Appeals, Third Circuit.

Argued Oct. 9, 1950.

Decided Jan. 2, 1951.

William A. Schilling, Newark, N. J., (John L. McMaster, New York City, on the brief), for petitioner.

Carlton Fox, Washington, D. C., (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Irving I. Axelrad, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before ALBERT LEE STEPHENS, MARIS and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The question in this case is whether a real partnership, within the meaning of the federal revenue laws, existed between the taxpayer and his wife. The Tax Court held that it did not.

Petitioner and his wife were married in 1919. He was then a bench hand employed in the jewelry trade. His rate of pay was 65¢ an hour. He testified that he " * * never made enough money to carry a home along." Mrs. Ardolina had worked in a factory prior to her marriage and she continued with that employment until 1924. She had a baby that year and remained home thereafter. Though she was forced to give up her outside job, she kept on with her income producing efforts. For about eight years after that she took in boarders and for a time not specified " * * * also strung beads as home work." In May, 1929, the taxpayer, Charles Dietz, for whom Ardolina had been working, and two other men, Messrs. Molcham and Knothe, went into business together in Irvington, Essex County, New Jersey. Initially a corporation was formed, the name of which was Admak Manufacturing Company. In about seven or eight months Dietz bought out Molcham and Knothe and he and Ardolina continued the business. They dissolved the corporation and formed a partnership under a written agreement dated August 15, 1934. The same business name was retained. Ardolina paid $500 into the original venture as his share of the capital. In his testimony he makes the source of this money very clear. Asked where it came from he answered: "When I worked for Mr. Dietz I never made enough money to carry a home along. I only made 65 cents an hour, and Mrs. Ardolina took in boarders. On top of that she did some other work outside. She used to string beads for the jewelry trade, stores, and that was moneys that she made doing part time work. She saved that money and gave me the $500 to go into this business."

Asked who contributed the money, he replied, "My wife." Mrs. Ardolina testified that she ran what was virtually a boarding house for about eight years. She said that with the money she thus earned she paid the rent and " * * * kept the house going, and I tried to save a little bit out of it." She stated that no part of the $500 came from her husband. Ardolina leaves no doubt but that it was the $500 which gave him his start. He said: " * * if it had not been for her help I never would have been able to go into business, and never had any money."

The August 15, 1934, agreement between Dietz and the taxpayer was the first of three partnership agreements entered into by Ardolina. Mr. Dietz died November 9, 1936. On November 30, 1936, the taxpayer

and the executors of the Dietz will entered into the second partnership agreement, consented to by Mrs. Dietz and her daughter, the residuary legatees and beneficiaries under the will of Charles Dietz.

This arrangement continued until the Spring of 1939, when complications arose with Mrs. Dietz and her daughter, who were, for practical purposes, Ardolina's partners. Because of this, the taxpayer wished to dissolve the partnership. His reasons were, as he testified, that, " * * these two women were of no help to me in business at all. All they were looking for was money, traveling all over the country, spending it faster than I could make it for them. The final blow came when they wanted me to advance them money before profits were made, and I thought right there it was time for me to quit." Ardolina called in the executors and legatees and told them he wished to dissolve the partnership. He "gave them preference" to buy him out, " * * * and if they did not want to buy me out, I was to buy them out" at book value. After consideration the Dietz' decided to sell and Ardolina purchased their interest for around $33,000.[1]

Immediately thereafter, on June 1, 1939, he formed the third partnership, which was with his wife. The agreement was in writing and almost identical in its terms with the original agreement with Charles Dietz. It recited that Mrs. Ardolina had purchased a half interest in the business for $33,-145.54, as evidenced by her promissory note of the same date. The articles provided that Ardolina was to devote himself entirely to the business and be " * * * in direct charge of the operation and management of the ordinary business of the said copartnership;" that Mrs. Ardolina "shall

in such manner as is possible, use her power and skill for the interest and advantage of said copartnership, but she shall not be required to devote any time or attendance to the business thereof, nor shall she receive any salary therefrom." Both parties were to have free access to the books and accounts of the business with half yearly reports and a complete yearly audit; Ardolina was to receive $10,000 a year salary; the net profits were to be apportioned and divided equally at least once every six months with losses to be borne by the partners in equal proportions; all checks required the signature of the taxpayer only; consent of both partners was necessary to any extraordinary business transactions of the co-partnership; on termination of the partnership all partnership property was to be equally divided between the parties.[2]

Petitioner testified that Mrs. Ardolina paid for her partnership interest with the $33,000 he had given her. He reported the gift upon a donor's return. The note given by Mrs. Ardolina was in evidence. It is marked, "Paid, July 31, 1939." Petitioner said that it had been paid by the money which he gave his wife. While perhaps of no great importance here, it is well to note that the evidence shows that various banks, insurance companies and the New Jersey Unemployment Compensation Commission were notified of the new partnership in due course and that a certificate of the new trade name was filed in the Essex County Court House, Newark, New Jersey. With regard to his reasons for bringing his wife into the business as a partner, petitioner said: "First, it was my wife that helped me, by taking in these boarders, and doing this extra work, and gave me this $500 to put up to go into this business; then, next, I felt it was time for me to show my appreciation and make her a partner in this

---

1. The findings of fact by the Tax Court give this figure as $31,342.50. The taxpayer testified that the price he paid for the Dietz Estate interest was the figure at which he sold to his wife. This was, said Ardolina, "around $33,000." It would appear that the original price of $31,342.50 on the Dietz Estate share was upped to $33,145.54 as a result of adjustments between Ardolina and the executors and legatees of the Dietz Estate.

2. But for a new profit division on an even basis, as opposed to a 60%–40% split (Ardolina receiving the larger share) under the earlier partnerships, these terms were the same in language and meaning as those of the Ardolina-Dietz and Ardolina-Dietz Estate partnerships, with the exception of the salary and check signing provisos, which were similar only to the arrangements under which the Ardolina-Dietz Estate partnership proceeded.

thing, in this new company. I had seen how the two women had spent all these sums of money, and I did not want the same thing to happen to my wife because I had felt that if I would take her into this business and show her the mechanics of the business, that if anything would have happened to me that she could have carried on and be independent herself."

He stated that this was his own idea and was not to avoid or evade income taxes. The Bureau, after auditing the gift, added to the cash a fifty per cent good will interest of $56,731.77 and this the petitioner accepted and paid.

The taxpayer, his wife and the company bookkeeper testified that since June 1, 1939, Mrs. Ardolina has been credited with and paid one-half the company's profits. Mrs. Ardolina said that she used part of such funds to pay her income taxes, help relatives and take care of personal expenses. The balance she invested. Her returns for the critical years of 1943 and 1944 show investment income of $4,072.92 and $5,226.25 respectively. "In 1943 revenue agents examined petitioner's returns for the years 1940 and 1941 and included in petitioner's income all the profits of the company. After protest, petitioner's returns were accepted as filed."[3] In July, 1946, the assets of the business were sold for $675,000. Petitioner stated that his wife received her share of the purchase price.

The Admak Company made radio tube parts to customers' specifications. As Ardolina said, "The customer would submit a specification and we would have to bid on the job, and if the bid was qualified we would get the job and then the tool makers would put them in the power presses and we would stamp out these stampings." According to him that kind of enterprise could have been operated by any other owner. It was not a personal service proposition but highly competitive.

The Tax Court held that "* * * petitioner's wife contributed neither outside capital nor services to the business; that she took no part in its direction; that the domination over the business exercised by petitioner appears to have continued after the gift to the wife in unchanged completeness; and that the income in question was the product of petitioner's services and the capital already in the business and under his complete control * * *. In addition, we are unable to find from the record that the wife actually received or could have received any of the proceeds of the business except at the will of petitioner. * * * Under all the circumstances, cf. Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L. Ed. 1659, we conclude that petitioner was essentially a sole proprietor before and after the gift, * * *, and, as set forth in our ultimate finding of fact, that he did not actually intend to join with his wife as a partner in the operation of the business from which the income was derived."

We have no quarrel with the legal principle presented in the Tax Court's ultimate finding of fact. It is the law that the existence of a family partnership for tax purposes is determined by the answer to the question of whether the parties had the bona fide intent "* * * to join together as partners". Commissioner of Internal Revenue v. Culbertson, supra, 337 U.S. at page 743, 69 S.Ct. at page 1215. That intention in that respect is a question of fact, Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 287, 66 S.Ct. 532, 90 L.Ed. 670.

The difficulty here is that the record does not support the Tax Court in its conclusion that the petitioner did not actually intend to join with his wife as a partner. We agree, of course, that taxes cannot be avoided in such situations as presented by Lusthaus[4] and Tower, where, as said by Mr. Justice Black in Tower, "* * * the result of the partnership was a mere paper reallocation of income among the

---

3. From Findings of Fact in Edward A. Ardolina, T.C. Memo.Op., Dkt. 16853 (Dec. 30, 1949).

4. Lusthaus v. Commissioner of Internal Revenue, 327 U.S. 293, 66 S.Ct. 539, 90 L.Ed. 679.

family members"[5] but, in this instance, we think that the Tax Court, while paying lip service to the governing law, has failed to recognize that all of the facts reveal a consummated effort which established the wife as a real partner in the concern she had helped so much to bring into existence. See Funai v. Commissioner of Internal Revenue, 4 Cir., 181 F.2d 890, 895. In the Culbertson opinion, Chief Justice Vinson laid down the rule for ascertaining the intent of the partners in family partnerships. He said, 337 U.S. at page 742, 69 S.Ct. at page 1214: "The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case, but whether, considering all the facts— * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."

■ It seems to us that the Tax Court, in passing upon the question of whether the Ardolinas were bona fide partners, failed to heed the direction of the Supreme Court that it consider all the facts. In addition, in two instances, vital facts specially mentioned by the court below were misconstrued. The first of these concerns the $500 contribution which put Ardolina in business. This was not his, as stated by the Tax Court, but his wife's. Respondent attempts to shrug this off by saying that even if it were earned by Mrs. Ardolina it was a gift from her to her husband. In its brief, respondent also asserts that the finding was a permissible one "in view of the testimony that taxpayer and his wife jointly rented the house and paid the rent." The only evidence is that the husband did take part in the negotiations for the house, but that the wife paid the rent either from the proceeds of her bead stringing or from the board money or both.

The Tax Court statement in footnote one of its opinion that "We are unwilling to reach the factual conclusion that petitioner's wife actually withdrew any of the business income", is an arbitrary finding contrary to the evidence. According to the uncontradicted testimony, Mrs. Ardolina did receive her 50% share of the net profits and from this she made various disbursements and investments. Documentary evidence supported that testimony.

■ The facts to be considered in ascertaining whether " * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise" are " * * * the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent * * *."[6] It seems advisable to deal with these specifically.

■ "The agreement." The only provisions of the agreement[7] which might, in other circumstances, possibly lead one to conclude that the partnership was not a bona fide one are identical with those under which the partnership had always functioned. In this regard, the principal such proviso is that which calls for Ardolina's exclusive management of the ordinary affairs of Admak. But, since at least 1934, this had been the method of operation under which Admak had prospered. There is no logical reason why this successful business should change its entire modus operandi simply because of the replacement of the inactive member of the partnership.

There are many other articles in the agreement which help to show an intent to enter into a bona fide partnership. Except as already noted, these terms are the same as those under which the two other partnerships proceeded. Some of these, as

5. Commissioner of Internal Revenue v. Tower, supra, 327 U.S. at page 292, 66 S.Ct. 532, 538.

6. Commissioner of Internal Revenue v. Culbertson, supra, 337 U.S. at page 742, 69 S.Ct. at page 1214.

7. That contract is in evidence, as are the original Dietz articles and the agreement with the Dietz executors and legatees.

heretofore stated, are: both partners were to have free and complete access to the business; semi-annual reports and a full yearly audit were called for; at least once every six months the net profits were to be evenly divided; any losses for such period were to be equally borne by the partners, the transaction of all extraordinary business affairs of Admak required the consent of both partners; on termination of the partnership all partnership property was to be equally divided between the parties.

Considered as a whole,[8] the agreement indicates the intention of the Ardolinas to join together in the present conduct of the Admak business.

"The conduct of the parties in execution of its provisions." We think that the conduct of the Ardolinas in the execution of the provisions of their agreement evidenced an intent to join together in the present conduct of the Admak Company. It appears from the record that all phases of the business continued to operate in a normal manner without change, and that the terms of their agreement were strictly adhered to at all times.

"Their statements." The statements of the parties vitally contribute to an acceptance of both their good faith and business purpose in entering into the present conduct of a joint enterprise. The taxpayer's motive of gratitude to his wife for giving him the help which started him as a co-owner of Admak cannot be fairly faulted. And the following reason for bringing his wife into the business makes sense and is, we think, a proper business purpose: Ardolina testified that the wife was taken into the concern during his lifetime in order that the company could be continued after his death under her management should he predecease her. In order to effectuate that purpose he wished her with him as a partner in time for him to teach her the mechanics of the business and familiarize her with it at first hand. The wife's statements round out a picture of an ideal relationship between these people which, under the particular facts, indicates the partnership agreement as one natural result thereof and reveals strong grounds for the desire to continue the business with Mrs. Ardolina in control should that become necessary.

"The testimony of disinterested persons." The only witnesses were the taxpayer, his wife and the Admak bookkeeper. There is, however, forceful disinterested evidence in the form of Ardolina's partnership articles with Dietz and his second agreement with the Dietz Estate. Both those documents show that he followed the same company policy with his wife as he had with his former partners—certainly some indication that the Ardolinas intended an honest partnership. The record of Mrs. Ardolina's payments and investment income which derives directly from her partnership profits is further disinterested evidence supporting the total true intent of the parties.

"The relationship of the parties." The relationship between the partners before us is that of husband and wife, but, in view of all the other facts supporting a conclusion favorable to the taxpayer, it does not seem that the existence of the husband-wife relationship in and of itself should be dispositive of the issue.

"Their respective abilities * * *." The respective abilities of the Ardolinas must be compared with those of their forerunners in Admak. Mr. Ardolina having been the other partner in all three partnerships, this comparison is limited to Mr. Dietz, the Dietz Estate and Mrs. Ardolina. The record does not tell us anything of Dietz' ability, though we know his obligations in respect to serving the business were the same as those of Mrs. Ardolina. It is not an unfair inference from the record to assume that Mrs. Ardolina's ability was greater than the ability lent to Admak by the Dietz Estate. It was due, in large part, if not entirely, to lack of comprehension of Admak's operations that unreasonable demands were made on the business by the Dietz legatees. So far as the record shows, and we are bound by it, no such

---

8. Both Tower, supra, 327 U.S. at page 287, 66 S.Ct. 532, and Culbertson, supra, 337 U.S. at page 742, 69 S.Ct. 1214 hold that the agreement must be considered as a whole.

lack of comprehension was shown by Mrs. Ardolina during her partnership. In addition, her background was one of competent, frugal management.

"Their respective * * * capital contributions." Mrs. Ardolina made a capital contribution to the venture of a little more than $33,000. Though this came to her as a gift from her husband, her freedom to enjoy the partnership profits and her actual enjoyment of them " * * * is strongly indicative of the reality of his [her] participation in the enterprise."[9] A Culbertson footnote points out that it is " * * * a basic and erroneous assumption that one can never make a gift to a member of one's family without retaining the essentials of ownership, if the gift is then invested in a family partnership." 337 U.S. at page 747, 69 S.Ct. at page 1217. See also Miller v. Commissioner of Internal Revenue, 6 Cir., 183 F.2d 246, 253 and cases there cited.

It is to be borne in mind that Mr. Ardolina's capital contribution upon his entry into the business was $500, which he received as a gift from his wife.

"The actual control of income and the purposes for which it is used." This has, in the main, been covered by the foregoing paragraphs on the Culbertson tests. However, though this may be repetition, it should be said that the control over income by Mrs. Ardolina was the same as that of her predecessor partners. The purposes for which the partnership income was used do not appear to have differed with the changes in partnership. Mrs. Ardolina exercised absolute control over her share of the profits and used the monies for her own purposes. Mrs. Ardolina proceeded to make outside investments from her profits, according to her wishes, and she did as she pleased with the income therefrom.

"Any other facts throwing light on their true intent." All of the evidence compels the conclusion that the Ardolinas' marriage resulted in such a fine, unselfish union of that couple, that their entire married lives down to the particular time in question naturally and honestly led up to the formation of their Admak partnership. The evidence leaves no doubt of their good faith in entering into that arrangement. The astounding success of the partnership under the family regime does much to justify the avowed business purpose of the partnership, namely, by the Ardolinas' joint present conduct of the enterprise to insure its sound operation to the wife's benefit after Mr. Ardolina's death, if he predeceased her.

Under all the facts of this case, we see no reason why what was obviously a valid partnership under two agreements should become invalid under the third, especially since, as the Supreme Court said in Tower, a leading family partnership case, supra, 327 U.S. at pages 286 and 287, 66 S.Ct. at page 535: "When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.' Drennen v. London Assurance Co., 113 U.S. 51, 56, 5 S.Ct. 341, 344, 28 L.Ed. 919; Cox v. Hickman, 8 H.L. Cas. 268. *We see no reason why this general rule should not apply in tax cases where the government challenges the existence of a partnership for tax purposes.*[10]" (Emphasis supplied.)

Viewed piecemeal, or as a whole, the agreement challenged is so nearly alike the prior agreements as to clearly indicate no change in business operation. Nor does it appear, as between the earlier and later partnerships, that there was any change in the conduct of the parties in the execution of the agreements' provisions. Tested by the general rule called for in the quoted passage, the earlier partnerships.

9. Commissioner of Internal Revenue v. Culbertson, supra, 337 U.S. at page 747, 69 S.Ct. 1210.

10. Quoted favorably in Culbertson, supra, 337 U.S. at pages 741–742, 69 S.Ct. 1210.

were proper. That the new partner was married to the partner continuing the business should not destroy the partnership's validity for income tax purposes when primary motivation other than tax avoidance and legitimate business purpose is shown.

The Tax Court's ultimate finding of fact that "petitioner and his wife did not actually intend to join together as partners in the conduct of the enterprise" is clearly wrong. Therefore, the conclusion of the Tax Court, based on that fact, that the " * * * petitioner was essentially a sole proprietor before and after the gift, * * * " is erroneous.

The decision of the Tax Court will be reversed.