Rose G. **HORNBACK**, Plaintiff,

v.

**UNITED STATES** of America,
Defendant.

No. 16134–4.

United States District Court
W. D. Missouri, W. D.

April 14, 1969.

Thomas E. King, Kansas City, Mo., for plaintiff.

John DeBruyn, Atty., Tax Dept., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

ELMO B. HUNTER, District Judge.

This is an action brought by Rose G. Hornback, a resident of Parkville, Missouri, to recover income tax and interest she claims was illegally assessed and collected by the District Director of Internal Revenue. Jurisdiction is conferred by Section 1346(a) (1) of Title 28, United States Code.

In Count I of her complaint plaintiff claims the Director of Revenue erroneously determined she failed to report as taxable income for the year 1959 the sum of $4,219.95, her alleged proportionate share of net profits realized from the operations of a trailer court, service station and ice sales. She asserts she was not in a partnership with her husband; had no interest in the mentioned net proceeds or in the business ventures

of her then husband Glenn C. Hornback, and received no taxable income therefrom. She states all such income was earned and received by Glenn C. Hornback.

In Count II of her complaint plaintiff claims the Director of Revenue erroneously determined that in 1960 she had failed to report the sum of $2,631.56 as her alleged proportionate share of net profits realized from the mentioned operations of a trailer court, service station, ice sales; and, further, erroneously determined she had received a taxable long-term capital gain from a property settlement in a divorce proceeding. The tax on this alleged capital gain was assessed and collected from her with interest and penalty in the total sum of $4,552.77. The case was tried to the Court without a jury.

*Background of Tax Dispute:* From the evidence adduced at the trial the following facts are found by the Court to have been established: Rose and Glenn Hornback were married on December 31, 1942. Prior to this marriage Mrs. Hornback, who possessed an 8th grade education, had obtained no business experience other than baby sitting. She had accumulated no assets of any consequence. Mr. Hornback, who also had accumulated little of consequence, was operating a rented filling station-grocery and sold ice and coal. After their marriage Mr. Hornback continued to operate these businesses. They first lived in a little two-room cabin behind the filling station. In another little cabin lived "Pop" who helped in the service station work. Apparently from the profits of these businesses from time to time over the years he purchased in a total of five transactions a number of small parcels of land, including that upon which the filling station-grocery was located, as well as the immediate surrounding area so that one large parcel of land resulted. Title was taken in the joint names of the Hornbacks, as husband and wife. She did not ask that it be taken in their joint names; he just decided to do it that way. She did sign the notes that were a part of the purchase price, as did he. Some $11,000 was still owed on these notes at the time of their divorce. It is agreed that under Missouri law they held title to the real estate as tenants by the entirety.

The mentioned tracts of land had been acquired by 1954. By then Mr. and Mrs. Hornback had moved from the small cabin behind the service station to a small house located on one of the purchased tracts, and the cabin was rented out. The purchased land had upon it several additional cabins, a few trailers, and was marked off for trailer and trailer space rental. The trailer space was sufficient for the parking of forty-eight trailers. Mr. Hornback fitted the trailer space for such rental by making available the usual gas and electrical facilities and by himself providing garbage disposal service.

Mr. Hornback each day worked from about 5:30 a. m. until late evening, usually about 10:00 or 11:00 p. m. He divided his time between the ice route, the coal business, the filling station business, the trailer and trailer space rental business, as well as a few other things.[1] He had a tractor-trailer to haul coal, two ice trucks, an oil truck, one for septic tank use, and a dump truck to haul gravel. At the trailer court he furnished fuel oil, bottled gas, read the electric meters, serviced to some extent the septic tanks, hauled trash, and performed a multitude of other assorted tasks as might need to be done to operate the trailer court.

Mrs. Hornback, by comparison, testified she spent "very few hours" in connection with any of these businesses. Excluding Saturdays the number of such hours totaled "less than five" per week. These consisted of such things as when her husband was away of occasionally answering the phone at the house and/or filling station, and waiting on (in limited

[1]. The ice business slowly diminished and was closed down January 1, 1960.

fashion) [2] customers at the filling station, taking telephone messages for her husband and upon limited occasions (generally in her husband's absence) showing a trailer or trailer space to a prospective tenant who was there inquiring about it. Most of them preferred to see her husband and she would direct them to return when he was home. On Saturdays which was rent day she spent several additional hours taking the bills owed by each tenant at the trailer court, which had been totaled by Mr. Hornback, and collecting them. He kept all the records. She spent no time in the business office and had no key to it in 1959–60. The check books to the bank accounts were kept there except for a check book to a personal account.

By 1959 they were living in the Elberdt trailer, which was 41 feet long, 8 feet wide and contained two bedrooms, a small living room, kitchen and bathroom. She had a personal phone listed as "Rose Hornback". There was also a business phone listed as "Hornback Service Station." If he was away and it rang she generally answered it. They usually wanted to talk to her husband and she would tell them to call back later for him. Later in 1959 as their personal relationship drifted, she would let the business phone ring, and he just had it taken out. He preferred to talk to prospective tenants, so she customarily had them return or telephone when he was at home.

Mrs. Hornback testified she had never intended to participate with her husband in business on a partnership basis. They never discussed their business relationship. They never filed a partnership income tax return. No social security payments were ever made to the Government for her during the marriage. She considered herself to be just a housewife who in that relationship occasionally helped her husband, but not as a business partner.

Mr. Hornback testified that "the entire operation was to me as a team", a husband and wife team. "I believe I would call it a partnership." He stated she helped him by answering the telephone, sometimes helping with customers if no one else was there to do it. She helped on occasion to show trailers and trailer space and to collect rent. The ice business was a minor one and the service station by 1959 "was a loser". She accepted all C.O.D. packages in his absence and paid for them.

All through the years in question Mr. Hornback had two or three employees helping in the business. He "discussed" these employees with her. He himself worked a seven day week from early morning until late in the evening. He gave Mrs. Hornback $50.00 each week for her expenses such as food, gasoline for her car and for spending money. She knew from collecting it what the income from the trailer business was but she did not know what the other business income was.

They separated as man and wife on August 14, 1959.[3] He moved to another trailer. She did upon a few occasions answer the phone for him and on her lawyer's advice collected the rent receipts. She did not make the bank deposits. The divorce took place on August 15, 1960.

Turning to their property settlement, Mrs. Hornback testified Mr. Hornback wanted to give her only $10,000.00. After she and he obtained lawyers, they (the lawyers) negotiated a written property settlement. She understood that under it Mr. Hornback was to give her "one-half—a sort of lump sum alimony", but payable in some installments as he couldn't pay all of it at once. Mr. Horn-

---

2. "I did not service some who came— just stayed in the house." * * * "Once in awhile but not too often."

3. The parties, at the Court's suggestion, have stipulated that the adjusted gross income shown as $8,439.91 on Exhibit A of plaintiff's Exhibit 7 attributable to the period of January 1, 1959, to August 14, 1959, when they separated and lived apart is $5,274.94.

back said he understood the property settlement represented one-half of the market value of all their jointly owned property.

Correspondence between their attorneys reveals that the entire property settlement was contingent upon a divorce being secured; that counsel for Mr. Hornback "had occasion to discuss the value of this (the tract they jointly owned) property with various real estate people and am of the opinion, based upon their suggestions, that the property together with the trailers could, at immediate sale, bring something in the neighborhood of $80,000 to $85,000. It further appears that there is a mortgage on the property and various liabilities consisting of some $11,000. I suggested to Mr. Hornback that one of the first things we would have to do is arrive at some figure of settlement; enter into a property settlement agreement; have some sort of an audit to determine the productivity of the present operation; and then attempt to either sell the property or acquire a loan sufficient to pay Mrs. Hornback the necessary amount under the agreement.

"It is my suggestion that we offer to Mrs. Hornback the sum of $35,000.00, payable upon the sale or acquisition of a loan on the property, deliver to Mrs. Hornback a 1956 Dodge sedan, together with a 1955 Nomad 40 foot trailer, plus the payment of your attorneys' fees (this amount I would like for you to advise as soon as possible.)

"In consideration for these things received by her, we would expect Mrs. Hornback to execute any and all instruments necessary to convey the real property to Mr. Hornback and to execute such instruments as are necessary to place the title to any trailers or vehicles, which are owned by Mr. and Mrs. Hornback, in Mr. Hornback's name."

Pursuant to this correspondence the parties entered into a written property settlement on June 2, 1960 "to finally and for all times settle and determine their property rights, all right of maintenance of second party by first party and all marital and homestead rights, etc." In pursuance thereof Mrs. Hornback conveyed to Mr. Hornback all her rights, title, and interest in and to the described land, to the trailers and personal property on the land in which she might have any interest or claim. In return for this she received a described Nomad trailer, which her husband by the agreement had first repaired a window pane in and had reconditioned the air-conditioner as well as recarpeted the trailer floor. Additionally as also required by the agreement he replaced the battery and repaired the muffler and exhaust on a Dodge automobile and transferred it to her. And finally he agreed to pay her attorney $500.00 for his service and agreed to pay her $36,000 in cash, "it being further understood and agreed that in order for said first party to pay unto second party the aforementioned sum, as herein provided, it will necessitate the mortgaging of said property referred to in paragraph 1 of this agreement. It is, therefore, agreed that party of the first part shall be given a reasonable time to accomplish said financing and party of the first part does hereby agree to make all expeditious efforts towards acquiring said funds in order to accomplish same."

Because Mr. Hornback had difficulty in obtaining the cash he needed to pay Mrs. Hornback, on August 3, 1960, they executed a supplemental property settlement agreement in whch Mr. Hornback agreed to pay $37,500 (instead of $36,-000.00) in equal monthly payments of $312.50 plus interest for a total of $416.-35 per month for a period of ten years, all secured by a First Deed of Trust on the property.

*Plaintiff's Legal Contentions on the Property Settlement Transition:* Plaintiff's counsel contends that (1) the property settlement transaction which was a part of the parties divorce proceedings in which plaintiff received certain property and money was not a taxable transaction, but rather was no more than an equitable division of their jointly ac-

quired and jointly owned property on a fifty-fifty basis. In essence it was intended to be and was a division in kind and not a sale; hence, it is not taxable. She was only receiving that which was already hers.

*The Government's Legal Contentions re the Property Settlement Transaction:* The Government's counsel contends the conveyance of plaintiff's property to her former husband was in legal effect a sale of her one-half interest in the property— i. e., a taxable transaction, and not a mere division in kind of their jointly owned property.

Neither party cites any case directly on point. The Government does cite Wren v. Commissioner, T.C. Memo 1965–62, P. 65,052 P–H Memo T.C. and the cases cited therein. Both counsel refer to United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962) as helpful in which the Court held that the transaction there in question, under Delaware law, did not amount to co-ownership of the property so that a transfer of it to the wife in a divorce settlement in satisfaction of her inchoate rights was not a division of property between co-owners, but was a satisfaction of a legal obligation of the husband. The Court further ruled that this satisfaction of a legal obligation by the transfer of property is a taxable transaction. In so ruling the Supreme Court stated: "There can be no doubt that Congress, as evidenced by its inclusive definition of income subject to taxation, i. e., 'all income from whatever source derived, including * * * [g]ains derived from dealings in property,' intended that the economic growth of this stock be taxed. The problem confronting us is simply when is such accretion to be taxed. Should the economic gain be presently assessed against taxpayer, or should this assessment await a subsequent transfer of the property by the wife? The controlling statutory language, which provides that gains from dealings in property are to be taxed upon 'sale or other disposition', is too general to include or exclude conclusively the transaction

presently in issue. Recognizing this, the Government and the taxpayer argue by analogy with transactions more easily classified as within or without the ambient of taxable events. The taxpayer asserts that the present disposition is comparable to a nontaxable division of property between two co-owners, while the Government contends it more resembles a taxable transfer of property in exchange for the release of an independent legal obligation. Neither disputes the validity of the other's starting point."

A summary of the pertinent tax law (as understood by the Court) is helpful:

First, it is reasonably clear from the teachings of the Davis case that if the transaction is simply a division or a partition of the jointly owned property of the parties it is not a taxable transaction. And this for the reason that essentially each party is but receiving his part or portion of the joint property. No sale is involved. This rule can be applied to divisions of real or personal property or money or a mixture of them. For example: (a) If husband and wife jointly own 1,000 acres of land worth $100,000; 100 shares of stock in X corporation worth $100,000 and a bank account of $50,000 and each took ½ of each, no taxable transaction results. (b) Or, if husband takes all the real estate and ½ of the bank account money (a total of $125,000) and wife takes all the stock and the other ½ of the bank account (a total of $125,000) no taxable transaction results. See, Wren v. Commissioner, T.C. Memo 1965–62, P. 65,052 P–H Memo T.C.

Second, it is clear from the teachings of the Davis case that if the transaction is not simply a division or a partition of the jointly owned property of the parties but essentially involves a sale by one spouse to the other spouse, then a taxable transaction results. For example, (c) if husband takes all the real estate and all the stock (a total of $200,000) and wife takes all the bank account (a total of $50,000) and also

receives from husband either his note for $150,000, or the sum of $150,000 that he has obtained from a loan or other source, a taxable transaction results. And this for the reason that the transaction is not just a division of their jointly owned property but is or includes a sale of the property of one spouse to the other spouse. The essence of the transaction is that husband has used money not a part of their jointly held property ($150,000 he has borrowed or his note) to purchase wife's portion of their jointly owned real estate and stock.

Both the logic and fairness of examples (a) and (c) are easily illustrated. If husband and wife jointly acquired the mentioned real estate some years ago for $10,000 it has appreciated $90,000. If husband and wife literally divide or partition the property (example a) so that each just gets his own proper part, there is no taxable transaction involved. Each has real property worth $50,000 with a $5,000 tax basis. If either later sells his property a taxable transaction results, and he is taxed on his $45,000 appreciation. But if husband uses borrowed money (example c) and gives $50,000 to wife for her half of the jointly owned property, and if it should be held as plaintiff here contends that the transaction was not a taxable one, husband would have property worth $100,000 that cost him $50,000 plus the $5,000 basis on the half that originally was acquired by him. The wife would have received $50,000 money in a tax free transaction for her property on which she had a $5,000 base. Obviously the use of the borrowed money in the given illustration results in a purchase and sale rather than a division of jointly owned property, and, as such, it results in a taxable transaction to wife who has received $50,000 in money for her property which she has conveyed away and which had a cost basis to her of $5,000.

Ordinarily one would think the type of transaction illustrated in this case and in example (c) above often would have been considered by the courts in published opinions. However, counsel have not cited any to the Court. A very helpful discussion is found in the publication of the American Law Institute and the American Bar Association's Joint Committee on Continuing Legal Education Publication, Tax Consequences of Marriage and Its Termination (Rudick) pages 146–7: "An equal division or partition of the community property of a couple pursuant to a property settlement will not constitute a taxable event because of each spouse's vested interest in one-half of the community property. Hence, neither spouse will realize gain or loss on the transfer of property, and the cost basis of the property will remain the same. There are, however, cases where the courts have ruled that a transaction was tantamount to a sale of the wife's share in the community property to her husband, despite the language of the agreement calling it a partition. Where a husband does, as part of the settlement, purchase the wife's share of community property for more than its basis, the wife will be taxable on her gain. The purchasing husband will take the purchase price as the new basis for the one-half interest purchased; the other half will retain the community basis. It is, of course, possible for the transaction to be reversed and the wife to buy the husband's interest in the community property. In that case the husband will be chargeable with the gain on the transfer and the wife will receive the new basis for one-half of the property.

"Each case must be examined on its own facts to determine whether there was a division, or a purchase and sale of property. The intent of the parties and the nature of the property passing to the wife are apparently the important factors. Absent an intent on the part of the parties to buy and sell the interest of one of them in the community property, the courts will not limit a division of property to circumstances where the property is entirely divided in kind. The distribution of all the community securities or cash to one spouse will not of itself result in there being a purchase

and sale. But where a wife received non-community cash and a personal note of the husband for the transfer of her one-half interest in community property there was a sale and not a division of the community property. Such a transaction is most likely to occur when the community property is made up almost entirely of one asset which is not suited to physical division, as a business. If the parties do not want to sell the business and divide the proceeds, they will have to enter into negotiations with each other which will result in a bargain and sale. The consideration the selling spouse receives will of necessity come from non-community property. Hence, it is not a division or partition of community property, but a purchase and sale.

\* \* \* \* \* \*

"Any partition or division, in kind or not, should leave the parties each holding an equal amount of community property valued at the current market price, or there may be a finding that one of the parties sold a portion of, or made a gift of, his or her property."

■ Applying the above principles of law to the facts at hand the property settlement here in question was a taxable transaction. The parties did not simply divide their jointly owned property. Rather Mrs. Hornback liquidated her interest in the joint property by sale. She sold her interest in the real estate to Mr. Hornback and he paid for it by his note which by the supplemental agreement was payable over a period of years. Many other aspects of the written property settlement and the action of the parties also indicate that a sale was involved instead of just a division of jointly owned property. It would serve no useful purpose to discuss them in view of the finding of sale already reached. The Director of Revenue did not erroneously determine that plaintiff had received a long term capital gain from the property settlement transaction.

*Contentions re the alleged business partnership in 1959–1960:* Plaintiff contends the Director of Revenue erred in finding and treating Mrs. Hornback as the business partner of Mr. Hornback in the ice, coal, trailer court and service station business and with having thereby received taxable income in 1959 and 1960. Defendant asserts the evidence discloses the Hornbacks did operate a business partnership which produced income taxable to Mrs. Hornback as determined by the Director of Revenue.

In Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, loc. cit. 741, 69 S.Ct. 1210, loc. cit. 1214, 93 L.Ed. 1659 (1949), the Supreme Court in describing the criteria for determining if a family partnership for income tax purposes exists referred to Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670 saying, "We there said that the question whether the family partnership is real for income-tax purposes depends upon

'whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their "agreement, considered as a whole, and by their conduct in execution of its provisions." Drennen v. London Assurance Corp., 113 U.S. 51, 56, 5 S.Ct. 341, 28 L.Ed. 919; Cox v. Hickman, S.H.L.Cas. 268. We see no reason why this general rule should not apply in tax cases where the Government challenges the existence of a partnership for tax purposes.'

"The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case, but whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income

and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." To the same effect is Eisenberg v. Smith, 263 F.2d 827 (3 Cir. 1959) and Ardolina v. Commissioner of Internal Revenue (3 Cir. 1951) 186 F.2d 176.

Applying the teaching of the Culbertson case to the facts as the Court finds them, there was no family partnership existing between Mr. and Mrs. Hornback in 1959 or in 1960.

 The Government does not strongly press its family partnership contention after the Hornbacks separated on August 14, 1959. It is reasonably clear that prior to that date Mrs. Hornback never intended to be a partner in Mr. Hornback's business enterprises. There is no evidence that they ever discussed a partnership. No accounting of the business profits or losses was ever made to her. They never filed a partnership tax return or signed any document or entered any agreement with anyone in which she was represented as being a partner.

She had no control over the income that Mr. Hornback received from the various business enterprises. At most she permitted some of the business enterprises to be conducted on property in which she had an undivided half interest, and she performed some services that assisted Mr. Hornback in the conducting of some of the business. All these were services such as any devoted wife might perform for her husband to help him, and it is clear from her testimony she did not intend thereby to be a business partner of his. The services were performed merely as an accommodation to her husband. Her contributions, both of time and talent were far less than his. Rather than give her a partnership share of any profits he gave her a weekly allowance of $50.00 for groceries and personal spending money, such as most husbands do with their wives. This $50.00

is entirely unrelated to the profits or losses of Mr. Hornback's various businesses. Considering all of the facts in the light of the Culbertson case it is clear that there was no family business partnership between them at any time during 1959 or 1960.

Thus the Commission erred in assessing her taxes and penalties on $4,219.95 in 1959 and on $2,631.56 in 1960. She is entitled to full reimbursement for those two years for the full amount she has paid under protest to the Commissioner, plus appropriate interest.

Judgment shall be entered in accordance with this opinion. The attorneys for the parties shall submit to the Court a computation of the judgment amount or advise the Court within thirty days if agreement cannot be reached.