WILLIAM R. POKUSA and KATHLEEN M. POKUSA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pokusa v. Commissioner
Docket No. 8038-75.
United States Tax Court
T.C. Memo 1978-93; 1978 Tax Ct. Memo LEXIS 422; 37 T.C.M. (CCH) 434; T.C.M. (RIA) 780093; March 7, 1978, Filed Stanley W. Sokolowski, for the petitioners. James F. Kearney, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioners' Federal income taxes as follows: Taxable
Section 6651(a) [1] year
Income tax
penalty
1972
$35,990.66
0
1973
3,317.67
$829.42
*423 Concessions having been made, the following issues remain for our decision: (1) A determination of the amount of gain that petitioners realized upon sale of the Sundowner Mobile Home Park (Sundowner), depending in part upon whether they are entitled to a stepped-up basis in the Sundowner equal to its value at the time petitioner Kathleen M. Pokusa received it pursuant to an agreement with her former husband; and (2) Whether the rent collected by petitioners on the Sundowner property prior to its sale, and which was credited to the balance due from the purchasers at closing, is income earned by petitioners and taxable to them. FINDINGS OF FACT Petitioners William R. and Kathleen M. Pokusa, husband and wife, resided in Lighthouse Point, Florida, at the time the petition was filed herein. Petitioners filed joint Federal income tax returns for the years 1972 and 1973. Petitioners' 1973 return was filed on April 3, 1975. During the period from September 11, 1948 to October 27, 1969, petitioner Kathleen M. Pokusa (hereinafter Kathleen) was married to James E. Tate (hereinafter Tate and Kathleen will be referred to as the Tates). At the time of their marriage, neither of the *424 Tates owned any appreciable property. During their marriage the Tates developed and operated a mobile home park and sales business in Ocean City, Maryland, under the name of the Sundowner. On August 16, 1963, the Tates acquired, as tenants by the entireties, the first block of realty for the Sundowner at a cost of $24,400. The Tates made such purchase with the proceeds of two mortgages on both of which they were jointly liable. In June 1964, the Tates acquired additional realty for the Sundowner at a cost of $52,000. A portion of the funds for such purchase was provided by a purchase money mortgage on which the Tates were jointly liable. The mortgages incurred by the Tates in the development and operation of the Sundowner were satisfied from the earnings of the Sundowner and from Tate's salary. The gross receipts of the Sundowner were generated through the rental of space for mobile homes and through the sale of mobile homes. During the period of the Tates' marriage, Tate was employed as a civil service employee with the Air Force and Kathleen was a civil service employee until 1964.After Kathleen left government service, she devoted hereself full time to the development *425 and operation of the Sundowner. Tate worked at the Sundowner mostly on weekends because he continued to work full time for the Air Force during week.
During their marriage, the Tates acquired through their joint efforts and contributions the following other properties which were owned jointly by them at the time of their divorce: a. Great Eastern Corporation which was a mobile home park similar to Sundowner. b. Great Eastern Mobile Home Sales, Inc., which was an operation similar to the mobile home sales of Sundowner. c. House and lot in Delaware.
d. Lot in Calvert County, Maryland. e. Stock in radio station WSMD. f. Stock in a high-rise mobile home structure corporation. g. House and lot in Ocean City, Maryland. h. Two lots in Fort Myers, Florida. On October 27, 1969, the Tates were divorced by a decree of the Superior Court of Delaware. Such decree contained no provision regarding a property settlement. Kathleen was not entitled to alimony because of the grounds on which such divorce decree was entered. As a result of such divorce decree, the Tates became owners as tenants in common of all their jointly owned property. Kathleen was awarded custody *426 of the Tates' 12-year-old son and provided his total support up to the time of the trial herein. After they had been divorced for about 15 months, and on January 30, 1971, the Tates "[agreed] to divide their property between themselves." Such agreement made no reference to any release of Kathleen's marital rights as a condition. As a result of the January 1971 agreement, Kathleen became the sole owner of the Sundowner. On March 11, 1972, Kathleen entered into a contract for the sale of the Sundowner to Exten Associates, Inc. (Sundowner Limited Partnership). On May 1, 1972, title to the Sundowner was conveyed to the Sundowner Limited Partnership. If petitioners are not entitled to a stepped-up basis then, at the time of the sale of the Sundowner in 1972, its adjusted cost basis was $95,799.87. For purposes of reporting their gain on the sale of the Sundowner, petitioners elected the installment sales method and used a stepped-up basis of $414,013.51. In his statutory notice, respondent determined that petitioners' basis in the Sundowner at the time of its sale was $95,799.87.In his amended answer, respondent asserted that the alleged deficiencies should be increased to *427 the amounts shown below because he had incorrectly computed petitioners' gain under the installment sales method in the deficiency notice: Sec. 6651(a) Year
Income tax
penalty
1972
$41,467.66
0
1973 [2]
3,440.01
$860.00
The contract of sale between Kathleen and the Sundowner Limited Partnership provided in part: "All space rental income for 1972 to go to the Buyer." Petitioners operated the Sundowner during the period from January 1, 1972 until May 1, 1972, during which time they collected space rental income in the amount of $58,190. Such amount did not include all space rentals due for 1972. Petitioners had complete dominion and control over such amount and it was used to pay operating expenses and loan payments relating to the Sundowner. Petitioners tried to collect the annual space rentals early in the year so that they could meet their February mortgage payment. Four tenants occupied their spaces year round but the remaining 172 tenants occupied their spaces *428 only during the months of May through September. The contract of sale for the Sundowner provided for payment of the $1,100,000 purchase price as follows: Cash at closing
$ 165,000
Principal amount of existing
mortgage to be assumed by
buyer
120,000
Principal amount of purchase
money mortgage
815,000
$1,100,000
At closing, the $58,190 of space rental income for 1972 was credited to the buyer, Sundowner Limited Partnership. Respondent concedes that the sales price of the Sundowner should be reduced by $58,190. On their 1972 return, petitioners did not include the $58,190 amount in their income but they did deduct various operating expenses of the Sundowner on Schedule C. In his statutory notice, respondent determined that the $58,190 of space rental income was includable in petitioners' income for 1972. Petitioners concede in their reply brief that respondent has correctly determined that they are liable for an addition to tax under section 6651(a) for 1973. OPINION We must first determine the amount of gain which petitioners realized upon the sale of the Sundowner. Petitioners argue that the transfer of the Sundowner to Kathleen pursuant to *429 the January 1971 agreement with Tate was a taxable event so that they are entitled to a stepped-up basis equal to approximately one-half of the fair market value of the Sundowner when it was transferred to Kathleen plus one-half of the adjusted cost basis of the Sundowner immediately before its transfer to Kathleen. Respondent argues that Kathleen received the Sundowner as part of a nontaxable division of property between co-owners so that petitioners are only entitled to carryover the adjusted cost basis of the Sundowner in the hands of the Tates. Petitioners have the burden of providing that the transfer of the Sundowner to Kathleen was a taxable transaction. Rule 142(a), Tax Court Rules of Practice and Procedure.They rely solely upon United States v. Davis,370 U.S. 65 (1962), in which the Supreme Court held that the husband's transfer of his property to the wife in full settlement and satisfaction of all her statutory marital claims and rights against the husband was a taxable exchange. The facts in Davis are far different from the facts in the instant case.In Davis, the taxpayer and his then wife made an agreement in 1954 calling for support payments *430 to the wife and minor child in addition to the transfer of certain property to the wife. Under state law, all the property transferred was owned by the taxpayer subject to certain statutory marital rights of the wife including a right of intestate succession and a right upon divorce to a share of the husband's property. Under these facts, the Supreme Court concluded that the disposition in Davis was not analogous to a nontaxable division of property between co-owners "for the inchoate rights granted a wife in her husband's property by the Delaware law do not even remotely reach the dignity of co-ownership." (370 U.S. at 70.) In the instant case, however, petitioners have not met their burden of proving that Kathleen was not a co-owner of all the property transferred pursuant to the January 1971 agreement. It is stipulated that most of the property involved in the January 1971 agreement was jointly owned by the Tates prior to their divorce and there is no evidence whatsoever to indicate that any of the other property involved in such agreement was the separate property of either one of the Tates. Furthermore, the record indicates that the Tates accumulated their *431 property through their joint efforts and contributions. It is also stipulated that as a result of their divorce, the Tates became owners as tenants in common of their jointly owned property. Therefore, since petitioners have not proved that the Tates were not co-owners of the property transferred pursuant to the January 1971 agreement, and since such agreement states simply that the parties "agree to divide their property between themselves" without any reference at all to the release of Kathleen's marital rights as a condition, the Tates' division of their property will be a nontaxable event if such division was intended to be equal. Beth W. Corporation v. United States,350 F. Supp. 1190 (S.D. Fla. 1972), affd. 481 F. 2d 1401 (5th Cir. 1973); Hornback v. United States,298 F. Supp. 977 (W.D. Mo. 1969). Since respondent has determined that the property division was a nontaxable event, petitioners have the burden of proving that such division was intended to be unequal in support of their attempt to equate the facts of the instant case to those in Davis,supra. They assert that Kathleen received properties *432 worth approximately $62,000 more than those received by Tate on the division, and that this excess value was "in full settlement and satisfaction of any and all claims and rights against the husband whatsoever." We need not decide whether such a difference in values alone would support petitioners' contention that the 1971 division was a taxable event, for petitioners have failed to prove that such division was not equal, or nearly so. To support their argument that the division was intended to be unequal, petitioners rely upon Kathleen's testimony and upon a worksheet on which the Tates listed the value of some of their property; however, such worksheet does not value all of the property which was divided in the January 1971 agreement. A lot in Calvert County, Maryland, stock in a high-rise mobile home structure corporation, stock in radio station WSMD, a second deed of trust secured against property in Clinton, Maryland, a deed of trust note secured against 62 acres owned by Great Eastern Mobile Home Sales, Inc., several trailers, and several "save harmless" agreements were not valued on the worksheet, but all of such property was transferred. Petitioners have presented no *433 evidence to establish the value of most of these items. Kathleen's testimony was equivocal and added little. Since the Tates have not proved that they were not coowners of the property in question or that they intended to divide such property unequally under the January 1971 agreement, United States v. Davis,supra, is clearly distinguishable. We hold that the Tates' division of their jointly owned property was a nontaxable event, Beth W. Corporation v. United States,350 F. Supp. 1190 (S.D. Fla. 1972), affd. 481 F. 2d 1401 (5th Cir. 1973), so that petitioners' basis in the Sundowner is an adjusted carryover basis equal to $95,799.87. Petitioners argue that the $815,000 purchase money mortgage should be included at less than its face value in computing their gain on the sale of the Sundowner. We disagree. It has not been proved that the purchase money mortage, which was secured by the Sundowner, had a fair market value of less than $815,000 but, regardless of its fair market value, section 453 requires the use of the face amount of the note in computing petitioners' gain on the sale of the Sundowner under the installment *434 sales method. Frizzelle Farms, Inc. v. Commissioner,61 T.C. 737, 742 (1974), affd. 511 F. 2d 1009 (4th Cir. 1975); Mason v. United States,365 F. Supp. 670, 673-675 (N.D. Ill. 1973), affd. 513 F. 2d 25 (7th Cir. 1975); sec. 1.453-5(a), Income Tax Regs.[3]
In his amended answers, respondent sought an increased deficiency in order to correct two errors which he allegedly had made computing petitioners' gain on the sale of the Sundowner in his deficiency notice. One error was purely mathematical and we hold that it should be corrected. The other asserted error was that respondent's computed "contract price" for installment sales method purposes did not include the amount of the existing mortgage (which was assumed by the buyers) to the extent that such mortgage exceeded petitioners' basis. *435 Section 1.453-4(c), Income Tax Regs., clearly supports respondent's position. Accordingly, we hold that the "contract price" of the Sundowner should include the excess of the mortgage assumed by the buyers over petitioners' basis. The second issue for our decision is whether the amount collected by petitioners as annual rental for spaces in the Sundowner, and which was credited to the purchaser at closing, is includable in petitioners' gross income for 1972. Respondent argues that the space rentals in the amount of $58,190 are includable in petitioners' income because petitioners received such amount at a time when they were owners of the Sundowner and they retained complete dominion and control over such amount until the closing occurred on May 1, 1972. Petitioners' position, however, is that the annual space rental income is not includable in their income because such rental income for the most part had not been earned by May 1, 1972, when it was credited to the purchasers at closing. It is well settled that income derived from property is taxable to the owner of the property. Helvering v. Horst,311 U.S. 112 (1940); 2 Lexington Avenue Corp. v. Commissioner,26 T.C. 816 (1956); *436 Ashlock v. Commissioner,18 T.C. 405 (1952). In 2 Lexington Avenue Corp. v. Commissioner,supra, we stated (26 T.C. at 825): the income in question was earned at a time when the greater bundle of rights or attributes of ownership, including title, possession, management, and the substantial burdens and possibly the benefits of the ownership of the property, were all still possessed by * * * [the seller], and hence * * * [the seller] and not the [buyer] was liable for the tax thereon. * * * [Emphasis supplied.] In the instant case, petitioners possessed the greater bundle of rights or attributes of ownership until May 1, 1972. Prior to such date, petitioners retained title to the Sundowner and exclusive possession of it. Petitioners paid, without reimbursement, all expenses incurred with respect to the operation of the Sundowner prior to May 1, 1972. Petitioners were responsible for offering a marketable title to the purchaser on May 1, 1972. Accordingly, we hold that the portion of the annual space rentals collected by petitioners, which is attributable to the period prior to May 1, 1972, is includable in petitioners' *437 taxable income for 1972. The 1972 space rentals attributable to the period after May 1, 1972, are not includable in petitioners' income. The $58,190 amount credited to the purchasers at closing was intended by the parties to represent space rentals and it was not an adjustment to the purchase price. [4]Hyde Park Realty, Inc. v. Commissioner,211 F. 2d 462 (2d Cir. 1954), affg. 20 T.C. 43 (1953). While petitioners may not evade their responsibility by assigning what are really their earnings, the 1972 space rentals attributable to the period after May 1, 1972, had not been earned but were merely collected. See Hyde Park Realty, Inc. v. Commissioner,supra.Furthermore, when they were earned the Sundowner Limited Partnership, not petitioners, was both the legal and beneficial owner of the Sundowner. Respondent relies upon section 1.61-8 (b), Income Tax Regs., [5] in arguing that the entire amount of 1972 space rentals collected by petitioners should be included in their 1972 taxable income because such amount was collected when petitioners were the owners of the Sundowner and petitioners had complete dominion and control over *438 such amount when collected. Respondent's reliance on section 1.61-8(b),, Income Tax Regs., is misplaced. Such regulation provides when rental income is reportable but not who must report it. Hyde Park Realty, Inc. v. Commissioner,supra.
Since we hold that the 1972 space rentals attributable to the period prior to May 1, 1972, are includable in petitioners' income, it is necessary to determine what portion of the $58,190 amount collected by petitioners is attributable to such period. Petitioners argue that only an insubstantial portion of such amount is attributable to the pre-May 1, 1972 period because their business was seasonal so that only four out of 176 tenants occupid their spaces *439 prior to May, although they paid year-round rent. We do not believe that the remaining 172 of petitioners' tenants would have paid a very large portion of the "annual" space rental to rent a space during the first four (off-season) months of 1972 unless by doing so they were able to reserve a space dursng the "reason." On the other hand, four of the spaces were occupied during the first four months of 1972 and the $58,190 amount does not represent all of the 1972 space rentals since some tenants had not paid their 1972 space rent prior to May 1, 1972. Although petitioners introduced no evidence of the amount of annual rental per space or the total space rentals for 1972, we are convinced that much less than $58,190, which amount respondent included in petitioners' 1972 income, is attributable to the period from January 1, 1972 to May 1, 1972. Accordingly, using our best judgment, we hold that $9,600 of space rental income is includable in petitioners' 1972 taxable income. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. Since petitioners used the income averaging method in their 1973 return, the 1973 deficiencies were increased as a result of respondent's asserted increase in their 1972 income.↩
3. the vendor may return as income from each such transaction in any taxable year that proportion of the installment payments actually received in that year which the gross profit (as described in paragraph (b) of section 1.453-1) realized or to be realized when the property is paid for bears to the total contract price. * * *↩
4. We note, without expressing our opinion as to its correctness, that respondent has conceded that the $1,100,000 sales price should be reduced by $58,190 for purposes of determining gain under the installment sales method. ↩
5. (b) Advance rentals; cancellation payments. Gross income includes advance rentals, which must be included in income for the year of receipt regardless of the period covered or the method of accounting employed by the taxpayer. * * *↩